| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>270 S. Tejon<br>Colorado Springs, CO 80901 | |
| | DATE FILED: June 29, 2020 4:39 PM<br>FILING ID: 5ED16AE77BA3A<br>CASE NUMBER: 2020CV31179 |
| **CALFOX, Inc.,** | |
| **Plaintiff,** | |
| **v.** | |
| **CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE NUMBER T0530BP1EB10018, GUIDEONE NATIONAL INSURANCE COMPANY, HDI SPECIALTY INSURANCE COMPANY, STARR SURPLUS LINES INSURANCE COMPANY,** | |
| **Defendant.** | **▲FOR COURT USE ONLY▲** |
| **ATTORNEY FOR PLAINTIFF:**<br>Jonathan E. Bukowski, #45614<br>MERLIN LAW GROUP, P.A.<br>1001 17th Street, Suite 1150<br>Denver, CO 80202<br>Phone: 720-665-9680<br>Fax: 720-665-9681<br>E-Mail: jbukowski@merlinlawgroup.com | Case Number:<br><br>Div.:        Ctrm: |
| **COMPLAINT AND JURY DEMAND** ||

      **COMES NOW** CALFOX, Inc., by and through its undersigned counsel, and hereby submit this its Complaint against Defendant, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE NUMBER T0530BP1EB10018, GUIDEONE NATIONAL INSURANCE COMPANY, HDI SPECIALTY INSURANCE COMPANY, STARR SURPLUS LINES INSURANCE COMPANY, and in support of its Complaint, allege and aver as follows:

### NATURE OF THE ACTION

      1.    Plaintiff brings this action seeking economic and non-economic damages arising from Defendant's breach of contract, bad faith conduct, unreasonable delay, and unreasonable

denial in the payment of covered benefits due and owing under Plaintiff's first-party insurance contract.

## PARTIES

2.      Calfox, Inc. ("Plaintiff" or "Calfox") is a California corporation with its principal office in Greenbrae, California.

3.      Defendant, Certain Underwriters at Lloyd's, London Subscribing to Certificate Number T0530BP1EB10018, GuideOne National Insurance Company, HDI Specialty Insurance Company, Starr Surplus Lines Insurance Company ("Defendant"), is an insurance exchange authorized to do business in the State of Colorado.

## JURISDICTION AND VENUE

4.      This Court has subject matter and personal jurisdiction over the parties to this cause of action.

5.      A cause of action exists under Colorado state law for claims regarding the conduct complained of herein.

6.      Jurisdiction is proper as to Defendant pursuant to Colorado Revised Statutes § 13-1-124(1)(a), (b), and (d) because Defendant conducted the business at issue in this action, committed tortious misconduct and contracted to insure property within El Paso County, Colorado.

7.      Venue is proper pursuant to Col.R.Civ.P. 98 because the events which constitute the basis of this Complaint and Jury Demand, including, but not limited to, the formation of the insurance policy and location of the property in question, occurred in El Paso County, Colorado.

## FACTS COMMON TO ALL COUNTS

### A.    THE PROPERTY

8.    Plaintiff is the owner of real property located in 3310-3795 Knoll Lane, Colorado Springs, Colorado 80917 (the "Property").

9.    The Property includes thirty-eight, one- and two-story, residential apartment buildings, an office/clubhouse, and eleven single-story detached carports.

10.    The exterior walls of the apartment buildings and office/clubhouse exhibited composite paneled siding with brick veneer accents.

11.    The roofs of the buildings at the Property are covered with asphalt-composition shingles with fiber-reinforced base mats.

12.    The roof coverings at the Property were less than twenty years old at the time of the Loss.

### B.    APPLICABLE PROVISIONS OF THE INSURANCE POLICY

13.    Plaintiff purchased an all-risk, replacement cost value, policy of insurance from Defendant under Policy Number EA2LOL-180012 (the "Policy").

14.    The Policy was issued with effective dates of May 30, 2018 through May 30, 2019.

15.    The Policy's insuring agreement states:

> **5.    Loss or Damage Insured**
>
> This policy insures against All Risks of Direct Physical Loss or Damage to property insured herein including General Average, salvage, and all other charges on shipments insured hereunder, excluding **Flood** and **Earth Movement**, or as amended in the Declarations Page, Manuscript Policy Form, or Endorsements attached hereto, occurring during the policy period as defined in the declaration pages.

16.    The Policy does not define Direct Physical Loss.

17.     The Policy does not define Direct Physical Damage.

18.     The Policy contains a notice provision, which states as follows:

**15.     Notice of Loss**

The insured shall report to the Insurer any loss or damage which may become a claim under the insurance policy as soon as may be practicable after it becomes known to the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured.

**16.     Knowledge of Occurrence**

It is agreed that Knowledge of an **Occurrence** by an agent, servant or employee of the Insured shall not in itself constitute knowledge by the Insured. Knowledge is understood to occur only when the Director of the Risk Management Department (or the individual acting in a similar capacity) of the Insured shall have received notice from its agent, servant or employee.

19.     The Policy contains the following provision under Endorsement No. 14 - Functional Damage:

Endorsement No. 14 – Functional Damage

We will not pay for **Cosmetic Damage** to **Roof Covering** caused directly or indirectly by the perils of Wind (including Named Storm) or Hail.

For the purpose of this endorsement, the following definitions apply:

**Cosmetic Damage** means that the wind and/or hail caused marring, pitting or other superficial damage that altered the appearance of the roof surfacing, but such damage does not prevent the roof from continuing to function as a barrier to entrance of elements to the same extent as it did before the cosmetic damage occurred.

**Roof Covering** means:

a.  The roof material exposed to the weather;
b.  The underlayments applied for moisture protection;
c.  All flashings required in the replacement of the roof covering.

20.     At the time of the Storm, the Property was "property insured" for purposes of the Policy's insuring agreement.

21.     During the underlying insurance Claim, Defendant determined and agreed that the Property was "property insured" for purposes of the Policy's insuring agreement.

22.     At the time of the Storm, direct physical loss of or damage caused by hail was a covered cause of loss under the Policy.

23.     During the underlying Claim, Defendant determined and agreed that hail damage to the Property resulting from the June 30, 2018, Storm, was a covered cause of loss under the Policy.

24.     Pursuant to its Policy, Defendant agreed to repair, rebuild and replace damaged Property with materials of like kind and quality.

25.     The Policy does not include a matching limiting endorsement or exclusion.

26.     The Policy does not limit or exclude coverage for direct physical loss or damage caused by hail to a roof covering resulting in a reduction of the useful life of the roof covering.

27.     The Policy does not limit or exclude coverage for direct physical loss or damage caused by hail to a roof covering resulting in a loss of performance of the roof covering.

28.     The Policy does not limit or exclude coverage for direct physical loss or damage caused by hail to a roof covering resulting in a loss in the market value of the roof covering.

29.     Defendant must pay for the cost to achieve a reasonable uniform appearance between the repair, rebuild or replacement of the damaged property and the materials existing on the Property. *See Hamlet Condominium Ass'n v. American Mutual Family Ins. Co*., 2016 CV 30594 (Co. Dist. Ct., April 12, 2017).

C.    **THE STORM**

30.    On June 30, 2018, during the Policy period, the Property suffered direct physical loss and/or damage resulting from a severe hail and wind storm (the "Storm").

31.    Among other things, hailstones from the Storm struck and damaged the roof coverings of the buildings at the Property, window screens, wood siding, wood trim, downspouts, gutters, heating and air conditioning cabinetry, heating and air conditioning condenser fins, and metal chimney covers (the "Loss").

32.    Plaintiff promptly reported its Loss to Defendant.

33.    Defendant assigned Claim Number 1000255138 to Plaintiff's Property loss (the "Claim").

D.    **DEFENDANT PERFORMS AN INVESTIGATION OF THE CLAIM**

34.    Defendant assigned Property Claims Manager, Kevin Ennis ("Ennis"), to Plaintiff's Claim.

35.    Defendant retained, Engle Martin & Associates ("Engle Martin"), to inspect the Property.

36.    Engle Martin is an independent loss adjusting company, which practices in Colorado, providing most of its services to the insurance defense industry.

37.    Upon information and belief, Engle Martin actively markets its services to insurance carriers and insurance professionals. The majority of Engle Martin's business in Colorado comes from insurance carriers like Defendant.

38.    Engle Martin assigned Russell Clark ("Clark") to the Claim.

39.    Defendant also engaged engineer Timothy Phelan ("Phelan") of Knott Laboratory, LLC.

40.    Upon information and belief, Phelan does not have training in meteorology and is not a forensic meteorologist.

41.    Phelan performed an inspection of the Property on January 9, 2019.

42.    Phelan did not identify any intervening hail damage between the Storm and his inspection in January 2019.

43.    Phelan documented hailstone impacts measuring between 0.50 inch and 1.50 inches in diameter.

44.    Phelan identified circular indentations consistent with hailstone impacts in the metal roof vent caps, isolated drainage downspouts, painted horizontal window sills, and condenser coil fins of the air conditioning units located throughout the Property.

45.    During his inspection of selected roof coverings of the apartment buildings, Phelan identified areas of granule loss with fractures through the shingle mats, i.e. functional damage. Phelan also identified areas of circular areas of granule loss with isolated fractures and/or bruising of the shingle mat, i.e. functional damage, during his inspection of the office/clubhouse buildings.

46.    Despite confirming functional hail damage to the inspected roof coverings, Phelan speculatively concluded that the asphalt-composition shingle roofing systems at the subject property were not damaged by hail from a hailstorm occurring in or since May of 2018 because the Storm did not produce large enough hailstones.

47.    On March 13, 2019, Engle Martin issued correspondence on behalf of Defendant notifying Plaintiff that it was denying the Claim ("Engle Martin Letter"). Defendant's denial was based on Phelan's speculative conclusion that the Storm did not produce hailstones large enough to damage the Property.  Defendant knew or should have known that issuing the denial in the Engle

Martin Letter constituted a failure to consider all other evidence it or Phelan collected of hail-caused damages to the Property.

48.    Defendant knew or should have known that Phelan did not have training in meteorological or weather analysis and that his estimated size of hail was based on unsupported speculation.

49.    The Engle Martin Letter further misrepresented that the hailstone impacts identified by Phelan to the metal roof vent caps, isolated drainage downspouts, painted horizontal window sills, and condenser coil fins of the air conditioning units were not covered under the Policy. To date, Defendant has never paid for hail damage to these components of the Property.

### E.    PLAINTIFF FORCED TO HIRE A PUBLIC ADJUSTER DUE TO DEFENDANT'S DEFICIENT INVESTIGATION OF DAMAGES TO THE PROPERTY

50.    Due to concerns with Defendant's scope of work and the substantial amount of covered damages omitted during the poor initial investigation of Defendant, Plaintiff was required to retain the services of a public adjuster to identify and provide a proper scope of work and estimate of the cost to repair the direct physical loss and damage to the Property.

51.    Plaintiff's public adjuster performed multiple inspections of the Property and documented a significant amount of hail damage overlooked by Defendant and its consultants during their initial investigation.

52.    Plaintiff's public adjuster prepared a 315-page package which included over 500 photographs which illustrated hail damage to Plaintiff's Property and prepared a repair estimate totaling $1,669,499.05.

53.    On September 20, 2019, Plaintiff's public adjuster issued a thirteen-page correspondence to Defendant detailing hail damage to the asphalt roof coverings preventing the

roof coverings from continuing to function as a barrier of the elements to the same extent as they did before the hail damage occurred. More specifically, Plaintiff's public adjuster provided Defendant with a meteorological report confirming large hail at the Property during the Storm. Plaintiff's public adjuster provided photographs distinguishing severe hail impacts to the roof coverings resulting from the Storm. Plaintiff's public adjuster provided Defendant with Technical Service Bulletins from shingle manufacturers, Owens Corning, GAF, and CertainTeed, confirming that the hail impacts documented by Phelan constituted damage to the roof coverings. Plaintiff's public adjuster further confirmed hail damage to the roof coverings, metal flashings, mechanical vents, gutter systems, paint, wood trim, windows, and heating and air conditioning units.

54.     On September 25, 2019, Plaintiff's public adjuster provided Defendant with its forensic data demonstrating unpaid hail damage to the Property, technical bulletins from shingle manufacturers, weather data from a meteorologist confirming ping pong sized hail during the Storm, and a sworn statement in proof of loss.

55.     On October 26, 2019, thirty days after supplying Defendant with its 315-page adjustment package, meteorological report, detailed photos, and expert observations, Plaintiff's public adjuster requested a formal response to its submission. Plaintiff's public adjuster further requested Defendant provide it with a specific and detailed breakdown of the agreed upon and disputed line items contained within its estimate and a full payment for each un-disputed item.

56.     On November 6, 2019, Engle Martin notified Plaintiff that Defendant would be rejecting Plaintiff's proof of loss.

57.     On November 7, 2019, Plaintiff's public adjuster, for a second time, requested Defendant provide a formal response to its document submission and provide payment for each un-disputed item within the repair estimate.

58.    On January 16, 2020, Plaintiff's public adjuster performed a reinspection of the Property with Phelan and Engle Martin. During the reinspection, Plaintiff's public adjuster pointed out hail damage to the roof coverings that caused exposure of the asphalt mat resulting in accelerated deterioration.

59.    On January 23, 2020, Engle Martin performed an inspection of the Property to investigate hail damage to the heating and air conditioning units and paint damage to siding and trim.

60.    On April 2, 2020, Engle Martin generated a repair estimating totaling $80,426.41. Engle Martin's repair estimate provided for the removal and placement of 2 window screens as well as the cleaning and painting of hail damaged trim throughout the Property.

61.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by preferring Phelan's opinion without giving due consideration to the contrary opinions of Plaintiff's public adjuster and engineer.

62.    The repair estimate did not include any allowance for repair of the hailstone impacts identified by Phelan to the metal roof vent caps, isolated drainage downspouts, painted horizontal window sills, and condenser coil fins of the air conditioning units.

63.    On April 7, 2020, Engle Martin, on behalf of Defendant, notified Plaintiff that it was reaffirming the denial issued on March 13, 2019.

64.    On April 14, 2020, Plaintiff's public adjuster issued correspondence in response to Engle Martin's letter of April 7, 2020. Plaintiff's public adjuster notified Defendant that the heating and air conditioning units sustained hail damage from the Storm in the form of silver impact marks on the condenser fins. Plaintiff's public adjuster further demanded Defendant reconsider its position on damage to the roof coverings. More specifically, Plaintiff's public

adjuster explained that the observed hail damage will result in accelerated degradation of the asphalt shingles. Plaintiff's public adjuster pled with Defendant to reconsider its coverage evaluation.

**F.    PLAINTIFF RETAINS A PROFESSIONAL ENGINEER AND FORENSIC METEOROLOGIST AND REQUESTS DEFENDANT ENTER INTO A TOLLING AGREEMENT BASED ON UNPAID HAIL DAMAGE**

65.    On May 22, 2020, Plaintiff requested that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster. Plaintiff also requested a copy of all reports and documents relied upon by Defendant in its coverage decision.

66.    On May 31, 2020, Plaintiff, for a second time, requested that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster. Plaintiff also requested a copy of all reports and documents relied upon by Defendant in its coverage decision.

67.    On June 5, 2020, Defendant notified Plaintiff that it was declining Plaintiff's request to enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages to the Property.

68.    Plaintiff subsequently engaged a certified meteorologist to perform a forensic evaluation of the weather impacting Plaintiff's Property on June 30, 2018. Plaintiff's meteorologist determined that the average size of hail affecting the property on June 30, 2018 measured 1.50 – 2.00 inches in diameter.

69.    The forensic meteorological evaluation was consistent with the hailstone impacts documented by Defendant's engineer, Timothy Phelan, during his January 2018 inspection of the Property.

70.    Plaintiff also engaged a Colorado licensed professional engineer to assist in the evaluation of hail damage to the Property. Plaintiff's engineer was tasked with determining whether the hailstone impact damage to the Property had resulted in direct physical loss to the roof coverings, direct physical damage to the roof coverings, decrease in functionality, decrease in the useful life, decrease in the performance, or damage preventing the roof from continuing to function as a barrier of the elements to the same extent as it did before the hail damage occurred.

71.    Plaintiff's engineer conducted an extensive two-day inspection of the Property between June 8, 2020 and June 9, 2020.

72.    Plaintiff's engineer documented evidence of widespread and randomly distributed hailstone impact indentations throughout shingle roof coverings at the Property. Plaintiff's engineer documented direct physical damage to auxiliary building materials and components, including tears to window screens, chipped paint, wood siding damage, wood trim damage, indented downspouts and gutters, indented heating and air conditioning cabinetry, indented heating and air conditioning condenser fins, and indented metal chimney covers.

73.    Plaintiff's engineer determined that the hailstone impacts to the observed shingle roof coverings had resulted in a decrease in functionality, decrease in the useful life, decrease in the performance, and resulted in damage preventing the roof from continuing to function as a barrier of the elements to the same extent as it did before the hail damage occurred.

74.    Upon information and belief, the functional damage to the shingle roof covering has also resulted in a diminution in the market value of the Property.

75.    Plaintiff's engineer concluded that hail damage damages to the individual shingles are permanent and cannot be repaired to pre-loss conditions through repairs which has resulted in a compromised system. Plaintiff's engineer further noted that these conditions were widespread,

and as such, individual shingle replacement is impractical and not a viable option. Plaintiff's engineer opined that full roof replacement down to the decking was warranted.

76.    On June 19, 2020, Plaintiff provided a copy of its meteorological report and engineering report to Defendant. Based upon this additional information, Plaintiff renewed its request that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster and engineer.

77.    On June 24, 2020, Plaintiff, for a fourth time, requested that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster and engineer.

78.    On June 26, 2020, Plaintiff, for a fifth time, requested that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster and engineer.

79.    On June 29, 2020, Defendant notified Plaintiff that its investigation was complete and that it would not enter into a tolling agreement. Defendant's June 29, 2020 correspondence demonstrated an intent or plan to put its interests above Plaintiff's as it was unwilling to consider Plaintiff's presentation of the claim.

80.    On June 29, 2020, Plaintiff again provided Defendant with additional information from its engineer demonstrating unpaid hail damage which had resulted in a decrease in functionality, decrease in the useful life, decrease in the performance, and resulted in damage preventing the roof from continuing to function as a barrier of the elements to the same extent as it did before the hail damage occurred. Plaintiff's engineer requested an opportunity to inspect the Property with Defendant's representative to discuss and jointly observe the hail damages sustained to the Property.

81.     On June 29, 2020, Plaintiff, for a sixth time, requested that Defendant enter into a tolling agreement to allow the Parties to work through the adjustment of the unpaid hail damages documented by its public adjuster and engineer.

82.     To date, Defendant has made no efforts to contact Plaintiff's engineer or meteorologist to discuss their investigation or analysis.

83.     Plaintiff has provided Defendant with objective documentation and analysis demonstrating that the functionality, useful life, and performance of the roof coverings have been decreased to hail damage. Plaintiff has also demonstrated that severe hail damage to the roof coverings has prevented them from continuing to function as a barrier of the elements to the same extent as it did before the hail damage occurred.

84.     Defendant's use of Endorsement No. 14 – Functional Damage as an absolute shield from liability is not only disingenuous, but sufficient evidence for a jury to determine that Defendant knowingly violated its duties under Colorado Revised Statutes § 10-3-1104 as Endorsement No. 14 does not limit or exclude from coverage the hail-caused damages Plaintiff has presented through the photographs, estimate, and engineering report provided to Defendant.

85.     The actions of Defendant have caused Plaintiff great financial harm. The cost of repairs to the Property in dispute have increased due to the unreasonable delay caused by Defendant's untenable position and its failure to consider the information provided by Plaintiff. Plaintiff has also incurred significant costs in its retention of a public adjuster, attorney, professional engineer, and meteorologist to confirm the unpaid damage to the Property.

86.     Defendant's unreasonable conduct, including its complete rejection of additional evidence from Plaintiff's engineer and meteorologist, has effectively compelled Plaintiff to institute litigation to recover amounts due under the insurance Policy.

87.     Plaintiff has cooperated with Defendant in its investigation of the Claim.

88.     Defendant refuses to provide the contractually required and covered benefits to Plaintiff.

89.     Defendant has breached its covenant of good faith and fair dealing that it owes to Plaintiff by engaging in a pattern of conduct designed to deprive Plaintiff of its rights and benefits under the Policy.

90.     Defendant's failure to pay the Claim has resulted in an unreasonable delay and denial of covered benefits to Plaintiff without a reasonable basis.

91.     Plaintiff has fulfilled all duties required of it under the Policy after discovery of the Loss.

92.     Plaintiff has performed all conditions precedent and subsequent required under the Policy, or alternatively, have been excused from performance by the acts, representations, and conduct of Defendant.

### FIRST CLAIM FOR RELIEF
**(Declaratory Relief)**

93.     Plaintiff realleges and reaffirms Paragraphs 1-92 as if fully set forth herein.

94.     Plaintiff seeks declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 et seq. and F.R.C.P. 57, as to its rights and obligations under the contract of insurance, including but not limited to:

        a.     That the Policy does not exclude coverage for direct physical loss or damage by hail to a roof covering resulting in a decrease in functionality of the roof covering.

        b.     That the Policy does not exclude coverage for direct physical loss or damage by hail to a roof covering resulting in a decrease in the useful life of the roof covering.

c.      That the Policy does not exclude coverage for direct physical loss or damage by hail to a roof covering resulting in a loss of performance of the roof covering.

d.      That the Policy does not exclude coverage for direct physical loss or damage by hail to a roof covering resulting in a loss in the market value of the roof covering.

95.      In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts. Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 et seq. and F.R.C.P. 57.

WHEREFORE, Plaintiff, Calfox, Inc., request that the Court determine the rights, status or other legal relations of the parties under the above law and facts, and for all other relief to which Plaintiff may be entitled.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

96.      Plaintiff realleges and reaffirms Paragraphs 1-95 as if fully set forth herein.

97.      Plaintiff purchased an all risk Policy requiring Defendant to pay for any and all fortuitous damages resulting from a loss not expressly excluded or otherwise limited by the Policy.

98.      The Policy between Plaintiff and Defendant is a binding contract.

99.      Plaintiff paid premiums and otherwise performed all conditions precedent to recovery of benefits under their Policy with Defendant.

100.      Defendant has denied certain covered damages and continues to delay and deny certain claimed damages as outlined above.

101.      Defendant's failure to honor its obligations under the Policy is a breach of contract.

102.      Defendant's breach of contract has damaged Plaintiff.

103.      Defendant is entitled to all benefits due and owing under the Policy.

WHEREFORE, Plaintiff, Calfox, Inc., respectfully request this Court enter judgment against, Defendant, Certain Underwriters at Lloyd's, London Subscribing to Certificate Number T0530BP1EB10018, GuideOne National Insurance Company, HDI Specialty Insurance Company, Starr Surplus Lines Insurance Company, for damages resulting from its breach of contract, costs, pre-judgment interest, attorneys' fees pursuant to applicable law, and such other relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
**(Unreasonable Delay and Denial of Payment of Covered Benefits Pursuant to C.R.S. §§ 10-3-1115 and 10-3-1116)**

104.    Plaintiff realleges and reaffirms Paragraphs 1-103 as if fully set forth herein.

105.    Under Colorado Revised Statute § 10-3-1115, an insurer who delays or denies payment to an insured without a reasonable basis for its delay or denial is in breach of the duty of good faith and fair dealing.

106.    Under Colorado Revised Statute § 10-3-1115, an insurer's delay or denial is unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action.

107.    Plaintiff is a first-party claimant within the meaning of Colorado Revised Statute § 10-3-1115(1)(b)(1).

108.    Defendant had the non-delegable duty to investigate the claim objectively and to advise Plaintiff of coverage under the Policy.

109.    Defendant delayed and denied payment of covered benefits to Plaintiff as alleged in the preceding paragraphs of Plaintiff's Complaint without a reasonable basis for its actions.

110. Defendant's failure to perform an industry standard investigation of Plaintiff's Claim led to a gross undervaluation of the Loss, and has resulted in a substantial delay of covered benefits to Plaintiff without a reasonable basis.

111. Defendant has unreasonably delayed payment to Plaintiff. Measured against objective industry standards for claim handling and payment, Defendant's actions have unreasonably delayed payment of the loss and damage.

112. The actions of Defendant have caused Plaintiff great financial harm. The cost of repairs to the Property have increased due to the unreasonable delay caused by Defendant's untenable position and its delays in generating an estimate for repairs of the exterior damage caused by the Storm. Plaintiff has also incurred significant costs related to its retention of a public adjuster, engineer, engineer, and meteorologist.

113. Defendant's failure to timely pay the Claim in full resulted in an unreasonable delay and denial of covered benefits to Plaintiff without a reasonable basis.

114. Defendant delayed Plaintiff's Claim by failing to objectively evaluate Plaintiff's Claim based on all available evidence, and not just evidence which Defendant believed supported its position.

115. Defendant's conduct has resulted in an avoidable harm to Plaintiff.

116. It is apparent from Defendant's conduct in the handling of the Plaintiff Claim that Defendant has adopted a plan or approach to delay, as much as possible, its handling and payment of the Plaintiff Claim.

117. Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by failing to properly investigate its insured's loss.

118.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by ignoring objective evidence of direct physical loss and damage to Plaintiff's property, including its refusal to consider additional information provided by Plaintiff's consultants.

119.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by preferring Knott's opinions without giving due consideration to the contrary opinions of Plaintiff's public adjuster, Plaintiff's engineer, Plaintiff professional engineer, or Plaintiff's meteorologist.

120.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by failing to include any allowance for damaged heating and air condition units.

121.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by misrepresenting the terms of its Policy to avoid payment of covered benefits to Plaintiff.

122.    Defendant delayed and denied payment of covered benefits to Plaintiff without a reasonable basis for its action by failing to pay covered benefits over two years after the occurrence of Plaintiff's covered loss.

123.    Defendant unreasonably delayed and denied Plaintiff's Claim by asserting coverage positions that it knew were without merit, including its misapplication of the cosmetic endorsement contained in the Policy.

124.    The actions of Defendant, including its refusal to enter into a tolling agreement, were intended to dissuade Plaintiff in pursuing benefits due and owing under the terms of the Policy.

125.    Based upon the foregoing Paragraphs, Plaintiff is therefore entitled to two times the covered benefit that have been delayed and denied to it, attorneys' fees, and costs pursuant to C.R.S. § 10-3-1116, together with pre-judgment interest at the highest rate allowed by law.

**WHEREFORE**, Plaintiff, Calfox, Inc., respectfully request this Court enter judgment against, Defendant, Certain Underwriters at Lloyd's, London Subscribing to Certificate Number T0530BP1EB10018, GuideOne National Insurance Company, HDI Specialty Insurance Company, Starr Surplus Lines Insurance Company, for damages authorized pursuant to Colorado Revised Statute § 10-3-1116, costs, pre-judgment interest, attorneys' fees pursuant to applicable law, and other such relief as the Court deems appropriate.

### FOURTH CLAIM FOR RELIEF
**(Common Law Bad Faith)**

126.    Plaintiff realleges and reaffirms Paragraphs 1-125 as if fully set forth herein.

127.    Under the Policy, Defendant owes Plaintiff the duty of good faith and fair dealing.

128.    An insurer breached its duty of good faith and fair dealing when it engaged in unfair claim settlement practices, denying and delaying due payment of available benefits under the Policy.

129.    As alleged above and among other circumstances, Defendant committed numerous, willful or reckless unfair claim settlement practices including, without limitation:

(a)    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance Policy it wrote and issued;

(b)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(c)    Refusing to pay claims without conducting a reasonable investigation based upon all available information, ignoring material information supplied by its insured and accepting obviously biased, result-oriented opinions from its retained expert to "justify" deficient assessments of its liability under the Policy;

(d)    Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear, such that the damages from the hail event exceeded the amount acknowledged as being owed by Defendant;

(e)    Failing to reasonably adjust and compelling insureds to utilize appraisal and/or litigation to recover amounts due under an insurance Policy by offering substantially less than the amounts ultimately recovered in proceedings initiated by its insureds;

(f)    Misrepresenting the terms and conditions of the Policy in an attempt to influence the insured to settle for less than all benefits reasonably afforded under the Policy for the subject loss and damage, including interposing unsupportable exclusions to deny and delay a meritorious, well-documented claim;

(g)    Encouraging its claim representatives to engage in unfair claims settlement practices against its insured, thereby violating applicable standards in the industry and the laws and regulations of the State of Colorado.

130.    Defendant has committed such actions willfully and with such frequency as to indicate a general business practice.

131.    As a direct and proximate result of Defendant's actions, Plaintiff has:

(a)    Incurred and will incur in the future increased costs to repair, restore and/or replace the significant property damage;

(b)    Suffered and will continue to suffer damages as a foreseeable and proximate result of the misconduct alleged; and

(c)    Suffered and will continue to suffer other expenses, including public adjuster fee, engineering fee, appraisal fee, umpire fee, loss of pre-judgment interest, attorneys' fees, investigatory fees, and other losses.

WHEREFORE, Plaintiff, Calfox, Inc., respectfully request this Court enter judgment against, Defendant, Certain Underwriters at Lloyd's, London Subscribing to Certificate Number T0530BP1EB10018, GuideOne National Insurance Company, HDI Specialty Insurance Company, Starr Surplus Lines Insurance Company, for all damages suffered as a foreseeable and proximate result of the conduct alleged herein, pre and post judgment interest, attorneys' fees in accordance

with applicable law, costs including expert witness fees, and such other and further relief as the

Court deems just and proper.

### DEMAND FOR JURY TRIAL

132.    Plaintiff demands trial by jury with respect to all claims and issues triable to a jury.

Respectfully submitted this 29th day of June, 2020.

/s/ Jonathan E. Bukowski
Jonathan E. Bukowski, Esq.
Colorado Bar No.: 45614
Merlin Law Group, PA
1001 17th Street, Ste. 1150
Denver, CO 80202
Telephone:  720-665-9680
Facsimile:   720-665-9681
E-Mail: jbukowski@merlinlawgroup.com