**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Raymond P. Moore**

Civil Action No. 20-cv-02443-RM-KMT

CALFOX, INC.,

     Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
SUBSCRIBING TO CERTIFICATE NUMBER T0530BP1EB10018,
GUIDEONE NATIONAL INSURANCE COMPANY,
HDI SPECIALTY INSURANCE COMPANY, and
STARR SURPLUS LINES INSURANCE COMPANY,

     Defendants.

---

## ORDER

---

This is a property insurance dispute arising from hail damage to Plaintiff Calfox, Inc.'s

("Plaintiff" or "Calfox") residential apartment buildings in Colorado Springs, Colorado. Calfox

sued several insurance companies, including the remaining Defendants GuideOne National

Insurance Company ("GuideOne") and Starr Surplus Lines Insurance Company, ("Starr" and

together "Defendants") which provided insurance coverage to Calfox under a subscription

policy. At issue now are the following motions: (1) Calfox's Motion for Determination of Law

and Partial Summary Judgment (ECF No. 82); (2) Starr's Motion for Partial Summary Judgment

(ECF No. 84); (3) Calfox's Motion to Limit Testimony of Defendant's Expert William J. Badini

Pursuant to Fed. R. Evid. 702 (ECF No. 119); (4) Calfox's Motion to Strike Testimony of

Defendant's Expert Grant Hoey Pursuant to Fed. R. Evid. 702 (ECF No. 120); and

(5) Defendants' Joint Motion to Exclude Expert Testimony of Sean O'Malley and Tyler Wood

Pursuant to Fed. R. Evid. 702 (ECF No. 123). The parties filed responses and replies. The

Motions are ripe for resolution.  Upon review of the Motions, relevant parts of the court record, and the applicable statutes and case law, and being otherwise fully advised, the Court finds and orders as follows.

## I.      BACKGROUND

Calfox owns a commercial property which is made up of 39 one- or two-story apartment buildings, an office/clubhouse, ten carports, and a pavilion, along with other amenities, and is located in Colorado Springs, Colorado.  (ECF No. 107.)  During the pertinent period, Defendants provided insurance for the property.  (Id.)  Plaintiff asserts that on June 30, 2018, a hailstorm damaged the property.  (Id.)  Calfox reported the storm and alleged damage to the insurance companies as required under the policy.  (Id.)  Defendants conducted an investigation into the claim.  (Id.)  Defendants retained a third-party claims administrator and loss adjuster, Engle Martin & Associates, and engaged Knott Laboratory LLC and its engineer, Timonthy Phelan, to inspect the buildings.  (ECF No. 105.)

In 2019, Mr. Phelan issued a report concluding that the roofs at the property were not damaged by a storm on June 30, 2018, or thereafter.  (Id.)  Engle Martin therefore informed Calfox that the claimed damage to the roofs would not be covered under the policy.  (Id.)  Calfox then had its public adjuster, C3 Group, Inc., ("C3"), provide its own report to Defendants which argued that the evidence demonstrated hail damage to the roofs.  (Id.)  Mr. Phelan again inspected the property, but his opinion remained unchanged and so did the coverage decision.  (Id.)  At some point, Calfox hired GRK Consulting Engineers Inc., ("GRK"), who then also inspected the property and provided a report to Defendants.  (Id.)  GRK, like C3, concluded that the roofs had suffered hail damage.  (Id.)  Defendants again declined to reconsider their coverage determination regarding the roofs.  (Id.)

As part of its coverage, the policy included "Endorsement No. 14—Functional Damage." (ECF No. 83-2, p.56.)  Much of the dispute between the Parties has turned, and continues to turn, on the language of that Endorsement.  It provides:

> We will not pay for **Cosmetic Damage** to **Roof Covering** caused directly or indirectly by the perils of Wind (including Named Storm) or Hail.
>
> For the purposes of this endorsement, the following definitions apply:
>
> **Cosmetic Damage** means that the wind and/or hail caused marring, pitting, or other superficial damage that altered the appearance of the roof surfacing, but such damage does not prevent the roof from continuing to function as a barrier to entrance of the elements to the same extent as it did before the cosmetic damage occurred.
>
> **Roof Covering** means:
>
> a.      The roof material exposed to the weather;
>
> b.      The underlayments applied for moisture protection;
>
> c.      All flashings required in the replacement of the roof covering.

(ECF No. 83-2, emphasis original).  Defendants apparently concluded that any damage caused by the June 2018 storm falls under the exclusion for cosmetic damage.

Calfox ultimately filed this suit in Colorado state court, and Defendants removed it to this Court.  (ECF No. 1.)  Calfox has since amended the Complaint, and currently raises four claims for relief.  (ECF No. 90.)  First, it requests declaratory relief, asking this Court to determine its rights and obligations under the insurance policy.  (Id.)  Specifically, it seeks a declaratory judgment stating that the policy does not exclude coverage for direct damage to the roof caused by hail and resulting in a decrease in functionality of the roof covering; that the policy does not exclude coverage for direct damage to the roof caused by hail and resulting in a decrease in the useful life of the roof; that it does not exclude coverage for direct damage to the roof caused by hail and resulting in a loss of performance by the roof; and that the policy does not exclude

coverage for direct damage to the roof caused by hail and resulting in a loss in the market value of the roof.  (Id.)  Second, Calfox alleges a breach of contract by Defendants based on the denial of coverage for certain claimed damage.  (Id.)  Third, Calfox states a claim for statutory bad faith pursuant to C.R.S. §§ 10-3-1115 and -1116.  Calfox argues that Defendants unreasonably delayed and denied the payment of covered benefits, thereby violating their duty under the statute.  (Id.)  Fourth and finally, Calfox raises a claim for common law bad faith, asserting that Defendants engaged in unfair claim settlement practices, denying payment due under the policy.  (Id.)  Defendants answered, raising a number of affirmative defenses.  (ECF No. 91.)

The Parties have now each filed motions for partial summary judgment, and Calfox has also sought a determination of a matter of law.  (ECF Nos. 82, 84.)  They have also each sought to exclude or limit the testimony of each other's expert witnesses.  (ECF Nos. 119, 120, 123.)

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the

evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. Purely legal questions can also be resolved on summary judgment. *See Horn v. CSAA General Insurance Co.*, 642 F.Supp.3d 1267, 1268 (D. Colo. 2022) (construing a so-called "Motion for Determination of Question of Law" as a motion for partial summary judgment); *Rabin v. Fid. Nat. Prop. & Cas. Ins. Co.*, 863 F. Supp. 2d 1107, 1109–10 (D. Colo. 2012) (treating motions for determinations of law as motions for summary judgment).

When the court is presented with cross motions for summary judgment, it "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (citations and quotations marks omitted). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Christian Heritage Academy v. Oklahoma Secondary School Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

### B. Contract Interpretation

Colorado law governs the construction of the insurance policy in this case. *Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006). Insurance policies are contracts that are interpreted as a matter of law. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). Courts must construe contracts in the manner which "best effectuates the intent of the parties." *Horn v. CSAA Gen. Ins. Co.*, 642 F. Supp. 3d 1267, 1271 (D. Colo. 2022) (quoting *Allstate Ins. Co. v. Avis Rent-A-Car System, Inc.*, 947 P.2d 341, 346 (Colo. 1997). "The words of the contract should be given their plain meaning according to common usage." *Huizar*, 52 P.3d at 819. "[An] insurance contract's terms are to be construed as they would be understood by a person of

ordinary intelligence." *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993). "[S]trained constructions should be avoided." *Id*. at 169 (quoting *Simon v. Shelter General Ins. Co.*, 842 P.2d 236, 239 (Colo. 1992)). "[T]he meaning of a contract must be determined by examination of the entire instrument, and not by viewing clauses or phrases in isolation." *Huizar*, 52 P.3d at 819.

### C. Expert Testimony

Federal Rule of Evidence 702 ("Rule 702") requires a district court to ensure that an expert's testimony is admitted only if it is reliable and relevant. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). To do so, the court follows three steps.

The court must decide "whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Bill Barrett Corp*, 918 F.3d at 770 (quoting Rule 702).

If the expert is sufficiently qualified, the court "'must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.'" *Id.* (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). In doing so, the court considers 1) whether "the testimony is based on sufficient facts or data"; 2) whether it "is the product of reliable principles and methods"; and 3) whether "the expert has reliably applied the principles and methods to the facts of this case." Fed. R. Evid. 702(b)-(d).

There are many factors which may bear on whether expert testimony is based on sound methods and principles, including the following: "whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific

community." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).  "'The focus, of course, must be solely on principles and methodology, not on the conclusions they generate.'" *Id.* (quoting *Daubert*, 509 U.S. at 595).  And, where a court concludes there is too great an analytical gap between the data and opinion offered, it is not required to admit such opinion evidence.  *Schulenberg v. BNSF Railway Co.*, 911 F.3d 1276, 1283 (10th Cir. 2018).

Finally, the court must determine whether the "proposed testimony is sufficiently 'relevant to the task at hand.'"  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (quoting *Daubert*, 509 U.S. at 597).  The court evaluates whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702).  That "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591-92.

The trial court has discretion to determine "*how* to perform its gatekeeping function under *Daubert*."  *Bill Barrett Corp.*, 918 F.3d at 770 (emphasis in original).  A *Daubert* hearing is not mandated.  *Id.*

## III.   ANALYSIS

### A.  Summary Judgment

In reviewing the cross-motions for partial summary judgment in this case, including Calfox's request for a determination of law, it is clear that the essence of the dispute between the parties is the meaning of the "Functional Damage" Endorsement in the insurance policy.  Therefore, although each motion for summary judgment is analyzed separately, the Court's conclusion as to each turns on the same analysis.

#### 1.  *Plaintiff's Motion for Determination of Law and Partial Summary Judgment*

Calfox moves for this Court to make a determination of law regarding the meaning of the Functional Damage Endorsement and grant it summary judgment for breach of contract.  (ECF

No. 82.)  With regard to the meaning of the Endorsement, Calfox first argues that it

"unambiguously requires a two-step analysis in determining whether a condition of damage is

cosmetic."  Calfox asserts that this two-step process requires first a determination of whether the

damage is more than "cosmetic."  "If the condition of damage is <u>not</u> 'cosmetic damage', the

Endorsement does not apply to the condition of damage."  (Id., p.6, emphasis original.)

According to Calfox, if the damage *is* "cosmetic," then the question becomes whether the

condition of damage "prevent[s] the roof covering from continuing to function as a barrier to the

entrance of the elements to the same extent as it did before the cosmetic damage occurred."

Calfox further urges this Court to adopt its definitions of the key terms of "elements,"

"marring," "pitting," and "superficial damage."  It argues that each of those terms is susceptible

to more than one meaning.  More specifically, Calfox argues that "elements" means any

condition of weather, including sunshine, rain, wind, hail, or snow.  It urges the Court to also

accept its conclusion that the words "marring," "pitting," and "superficial damage" mean minor

conditions that are unrelated to hailstone impact.

Finally, Calfox asks this Court to decide that the Endorsement does not apply to damage

that reduces or impacts the functionality, performance, or lifespan of the roof surface.  Calfox

then asks for summary judgment finding that Defendants breached the insurance contract.

Defendants filed separate responses.  (ECF Nos. 99, 100.)  Both agree, however, that the

Court should reject Calfox's interpretation of the Functional Damage Endorsement.  Starr further

argues that genuine issues of material fact remain that preclude summary judgment on the claim

of breach of contract.  Both Defendants argue that the Functional Damage Endorsement is

unambiguous.  Defendants argue that the terms "marring," "pitting," and "superficial damage"

are clear when read in the context of the Endorsement and that they clearly are related to damage

from hail.  GuideOne asserts that "[s]uperficial damage caused by hail or wind, such as can be

described as 'marring' or 'pitting,' which alters the appearance of the roof surface is cosmetic damage." (ECF No. 99, p.5.) Defendants also argue that "if the roof fails to perform its function to the same extent as it did before the peril due to damage, then the damage is not 'cosmetic.'" (Id.)

Starr also argues that Calfox's definition of "elements" is overbroad in that, in Starr's view, it does not include sunshine or UV rays. It argues that, because the Endorsement discusses damage that does not prevent the roof from functioning as a barrier to the entrance of the elements, "'elements' must be capable of penetrating through the roof . . . . Plaintiff has provided no evidence that UV rays can penetrate the roof." (ECF No. 100, p.15.)

Finally, Starr makes an argument based on the legal premise that when two different terms are used in close proximity, they must have different meanings. Thus, Starr points out that the Endorsement discusses the "roof surfacing," "roof covering," and "roof." "Roof covering" is defined in the Endorsement as "a. [t]he roof material exposed to the weather; b. [t]he underlayments applied for moisture protection; c. [a]ll flashings required in the replacement of the roof covering." (ECF No. 83-2.) Starr argues that "it is unambiguous that 'roof surfacing' means those areas of the roof that are capable of having their appearance altered by hail, specifically, as applicable in this case, shingles." (ECF No. 100, p.7.) Because these two terms have distinct meanings, Starr asserts, "roof" as it is used in the Endorsement must also have a unique meaning, and Starr believes that, when read in context, the meaning is unambiguously the entire structure that is "on top of the building and prevents entrance of the elements into the interior of the building, including shingles, flashing, underlayment, and the nailable surface or decking to which these elements attach." (Id., emphasis original.) Thus, Starr contends that "in order for damage to not be 'cosmetic damage', the roof must be leaking." (Id. p.8.) Starr points out that Calfox has presented no evidence that the roof on any of its buildings is leaking,

therefore meaning that any damage sustained was merely cosmetic.

In its Reply, Calfox argues that anything that removes any granules from the top shingle layer of a roof like the ones on its buildings "will <u>always</u>" reduce the roof's ability to act as a barrier to the entrance of the elements. (ECF No. 106, p.3, emphasis original.) Plaintiff states that this is because each of the individual layers of an asphalt shingle "serves a critical purpose to the shingle system, including protection from the elements." (Id.) Once the first layer of granules is removed, Calfox asserts, exposure to sunlight or UV will degrade the second layer of asphalt and the third, fiber reinforcement layer. Because of these traits, unique to asphalt shingles, Calfox contends that the Endorsement is ambiguous when applied to damage to an asphalt shingle roof.

Calfox also briefly addresses Defendants' contention that in order to fall outside the Endorsement, damage must result in the penetration of the elements through the entire roof assembly. Calfox argues that this interpretation of the Endorsement is "completely at odds with the plain language of the Endorsement which simply requires that the condition of damage 'prevent the roof from continuing to function as a barrier to the entrance of the elements <u>to the same extent</u> as it did <u>before the cosmetic damage occurred</u>.'" (Id. p.6, emphasis original.) Calfox reasons then that this means that if there is *any* decrease or reduction in the ability of the *roof coverings* to act as a barrier to the elements, the damage falls outside the Endorsement. Calfox does not directly address Starr's argument regarding the meaning of the word "roof" as used in that portion of the Endorsement.

The Court has reviewed the policy and agrees in part with each of the Parties. First, the Court disagrees with Calfox's reading of the terms "pitting," "marring," and "superficial damage" as being unrelated to hail damage. The Endorsement specifically states that it will not apply to cosmetic damage to the roof covering caused by *wind or hail*. (ECF No. 83-2.) It then

defines "cosmetic damage" *for the purpose of the Endorsement*.  And if that weren't clear enough, it then states that "cosmetic damage" "means that the *wind and/or hail caused* marring, pitting or other superficial damage that altered the appearance of the roof surfacing . . . ."  (Id.) In the Court's view this language is unambiguous, and in context Calfox's reading is entirely nonsensical.  Thus, the Court finds that the terms "marring," "pitting," and "superficial damage" mean damage caused by hail or wind.

Turning next to the term "elements," the Court agrees with Calfox that Defendants have not offered any support for their argument that it must be limited to wind and precipitation. Defendants seem to argue that sunshine and UV rays cannot penetrate through the roof, and therefore cannot be included within the meaning of "elements" as used in the Endorsement.  The Court disagrees.  It would seem nonsensical if a roof that is so damaged by wind and hail that it allows sunlight into the body of the building were to be excluded under the Endorsement.  Surely one of the purposes of a roof is to prevent the occupants of a building from being sunburned, as well as to keep them dry.  Furthermore, as Calfox points out, as the drafters of the policy, Defendants could have spelled out the meaning of "elements" more narrowly, but they did not do so.  The Court concludes, therefore, that "elements" has its plain and ordinary meaning, including sun and UV rays as well as wind and precipitation.

The Court must next construe the word "roof" as it is used in the pertinent phrase of the Endorsement.  The Court acknowledges that generally, three distinct phrases would need to have three distinct meanings.  However, under Colorado law, interpretation of insurance contracts must be reasonable and natural, rather than strained or technical.  *Ace American Ins. Co. v. Dish Network, LLC*, 883 F.3d 881, 887 (10th Cir. 2018).  "Words used in an insurance policy 'should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended.'"  *Compass Ins. Co. v. City of*

*Littleton*, 984 P.2d 606, 613 (Colo. 1999) (quoting *Chacon v. American Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990)).  Furthermore, courts should construe insurance contracts liberally to provide the broadest possible coverage to the insured.  *TCD, Inc. v. Am. Fam. Mut. Ins. Co.*, 2012 COA 65, ¶ 11, 296 P.3d 255, 257–58.

In this case, the Court concludes that, in context, "roof" means "roof covering."  In context, the Endorsement is intended to exclude coverage for cosmetic damage to the roof covering.  Thus, it is the performance of the roof covering itself that is at issue.  To construe it as Defendants request would lead to absurd and unreasonable results—the entire roof includes many elements, such as rafters and trusses.  Surely coverage is not eliminated if hail or wind fail to penetrate the roof trusses.

Finally, Calfox asks the Court to find that the Endorsement does not apply to conditions of damage that reduce or impact the functionality, performance, or lifespan of the roof surfacing.  On this, the Court must agree with Defendants.  Calfox's interpretation is overly broad, and the plain language of the Endorsement is clear.  The Endorsement applies to any damage that is cosmetic in nature and which does not prevent the roof from continuing to function to keep out the elements.  If the damage is cosmetic but will ultimately result in a shorter lifespan for the roof, as long as the elements cannot penetrate, the damage is excluded.  To the extent that "functionality" and "performance" mean the function and performance of the roof as a barrier to the elements, if the roof can no longer do so then the damage is not covered by the Endorsement.  If, on the other hand, "functionality" and "performance" refer to some distinct purpose for a roof, as long as the roof still functions as a barrier to the elements, the damage will fall within the Endorsement and will not be covered.

The question remains whether there is a genuine dispute of material fact between the parties on Calfox's breach of contract claim.  The Court concludes that there is such a dispute,

and that therefore summary judgment is not warranted.  First, the Court concludes that the evidence is conflicting regarding whether the roof continues to act as a barrier to the elements. Calfox presented some evidence that there are holes in some shingles, permitting water to seep into the shingle below.  Starr, however, disputes *when* that damage occurred—Starr asserts that the damage observed was not consistent with the June 2018 storm.  Starr also argues that the fractures in the shingles may have resulted from a cause other than hail entirely.  Finally, Starr asserts that any failure to perform on its part was excused by Calfox's breach of the concealment, misrepresentation or fraud provision.  Specifically, Starr argues that Calfox breached the provision by misrepresenting and exaggerating the cost of repairs to the property.  For all of these reasons, the Court concludes that summary judgment is not appropriate on this claim. Calfox's Motion is therefore DENIED to the extent it seeks summary judgment on its contract claim.  The Motion is GRANTED to the extent that it asks the Court to interpret the provisions of the Endorsement.

### 2.  *Starr's Motion for Partial Summary Judgment*

Starr asks the Court to grant it partial summary judgment on Calfox's claims to the extent that those claims allege a breach of contract or bad faith in denying coverage under the policy. (ECF No. 84.)  Specifically, Starr first argues that the Endorsement applies to the damage in this case because there is no evidence that the roof has leaked into the interior of the building.  It contends that the correct reading of the policy precludes coverage and therefore requires summary judgment in its favor on Calfox's claim for breach of contract.  It also argues that, because the damage is not covered, it could not act in bad faith when it denied the coverage to which Calfox was not entitled.  Therefore, Starr argues that it is entitled to summary judgment on Calfox's common law and statutory bad faith claims.  It argues, in the alternative, that even if its reading of the policy language was incorrect, it did not act unreasonably or in bad faith as a

matter of law.  It also asserts that it acted reasonably when it relied on the engineering report of its expert, Knott Laboratory.

Calfox unsurprisingly disagrees.  (ECF No. 97.)  Calfox first argues that no leaking into the building is required under the Endorsement, and that it has presented evidence that the roof no longer functions as a barrier to the elements to the same extent that it did before it was damaged by the hailstorm.  It therefore asserts that the damage was covered under the policy and that Starr breached the contract when it denied coverage.  Calfox also argues that its extracontractual claims survive summary judgment because it has presented evidence that Starr acted unreasonably under the standards generally applicable to the insurance industry.  Calfox also asserts that the Knott Laboratory investigation was flawed, and that it was unreasonable for Starr to rely on its results.

Starr filed a Reply in which it again argues that there is no coverage under the policy for the damage to Calfox's roofs, and that therefore both the contract claim and the extracontractual claims must fail.  (ECF No. 104.)  It also repeats its arguments that it reasonably interpreted the policy as a matter of law and that it acted reasonably as a matter of law when it relied on the Knott Laboratory report.

As the Court has already discussed above in its analysis of Calfox's Motion, it concludes that the policy does not require proof that there is leaking in the interior of the building in order to bring damage outside the coverage of the Endorsement.  Thus, the fact that there is apparently no evidence that there is leaking inside the buildings does not resolve the question.  Again, the Court has already concluded that a genuine issue of material fact remains regarding whether or not the roof continues to function as a barrier to the elements to the same extent that it did before the June 2018 storm.  Therefore, summary judgment is precluded on the breach of contract claim.

The Court also concludes that summary judgment is inappropriate with regard to Calfox's bad faith claims.  Calfox has presented some evidence, in the form of an expert opinion, that Starr acted unreasonably under industry standards when it interpreted the policy to preclude coverage and in the manner in which it investigated the claim.  The Court concludes that Calfox's evidence is sufficient to create a genuine dispute of material fact on the bad faith claims.  So, Starr's Motion for Partial Summary Judgment is also DENIED.

**B.  Plaintiff's Motion to Limit Testimony of Defendant's Expert William J. Badini Pursuant to Fed. R. Evid. 702**

Calfox next asks the Court to limit the opinion testimony of Defendants' expert, William Badini.  (ECF No. 119.)  Calfox does not contest Mr. Badini's credentials, and the Court concludes that he is adequately qualified to opine in this case.  Rather, Calfox argues that Mr. Badini's methodology was unreliable.  Mr. Badini has been endorsed by Defendants as a forensic meteorologist to offer his opinion that the hail that fell on June 30, 2018, around Calfox's property was a maximum of one inch in diameter.  Calfox notes that Mr. Badini relied on two primary sources of information regarding the hail size, namely the National Weather Service—Local Storm Report ("LSR") and the Community Collaborative Rain, Hail & Snow Network ("CoCoRaHS").  Calfox points out that both of these services rely on data obtained through crowdsourcing.  In other words, members of the public report their observations to the organizations which then compile the data.  Calfox argues that no formal training is required for individuals to participate in these community projects, and that all volunteers are welcomed, rendering the data gathered unreliable.

Starr responds that the methodology used by Mr. Badini is commonly used by meteorologists in order to determine hail size.  (ECF No. 131.)  Starr argues that, in fact, CoCoRaHS does provide training and education to all observers and the resulting reports are

known to be precise, "typically to the one ten-thousandths of a degree in accuracy." (Id., p.7.) Starr also asserts that Mr. Badini relied on additional information, including available radar data, and calculated the location and direction of the storm as it formed, strengthened, and impacted Calfox's property. Finally, Starr contends that Calfox's arguments go to the weight of Mr. Badini's opinions, not their admissibility, and points out that Calfox is welcome to pursue these questions in its cross-examination of Mr. Badini.

The Court agrees with Starr that Mr. Badini's opinions are based on sufficiently reliable methodology and that the issues raised in Calfox's Motion go to the weight that jurors should give those opinions. Calfox will have the opportunity to ask Mr. Badini about his sources of information during cross-examination. It will then be for the jury to decide whether or not to believe Mr. Badini's opinions. The Court therefore DENIES Calfox's Motion to Limit the Testimony of Mr. Badini.

### C. Plaintiff's Motion to Strike Testimony of Defendant's Expert Grant Hoey Pursuant to Fed. R. Evid. 702

Calfox next asks the Court to preclude the testimony of Defendants' Expert Grant Hoey. (ECF No. 120.) Defendants have endorsed Mr. Hoey to opine on the reasonableness of the cost of repair estimates provided by Calfox's witnesses. Calfox again argues that Mr. Hoey's opinions are not based on a reasonable methodology, and also adds that they are not based on sufficient facts and data. Specifically, Calfox takes issue with Mr. Hoey's statement that he "thinks" that the standard in the industry is to choose the lowest bid in selecting a contractor. Calfox argues that these are "personal preferences guised as expert opinions" and that they are not based on "an applied scientific methodology." (Id. p.7.) Calfox also takes issue with Mr. Hoey's conclusion that it should not have sought to replace its HVAC units with upgraded models and argues that he lacks the data to support any opinion about the relative efficiency of

the different HVAC units.

Calfox also disagrees with Mr. Hoey's opinion that the overhead and profit numbers used by Calfox's public adjuster are too high and points out that Mr. Hoey used a different listing in Xactimate, construction management fees, to reach that conclusion.  And notes that Mr. Hoey used new construction as the price model for his opinion, while in this case the work will be in the nature of restoration.  Finally, Calfox asserts that Mr. Hoey has not adequately disclosed his methodology, and to the extent that he has done so, the information reveals that his opinions will not be helpful to the trier of fact.  Calfox notes that Mr. Hoey relied on a non-competitive bid from a roofing company in assessing the reasonableness of the estimates from Calfox's witnesses.  And Calfox argues that basis of Mr. Hoey's estimate is unclear, as he states it in vague terms such as "recent discussions with subcontractors" and that he could not identify the sources of his other data points.

Starr responds that Mr. Hoey's methodology is reliable and fully disclosed in his expert report.  (ECF No. 132.)  It argues that Mr. Hoey's opinions are based on industry standard estimating techniques, the type reasonably relied upon by experts in the field.  Starr notes that one of Calfox's experts, Tyler Wood (discussed below) relied on a similar methodology in order to form his opinion on the reasonableness of the cost estimate.  Starr also argues that Calfox misapprehends some of Mr. Hoey's opinions, pointing out that he offers no opinion on the relative efficiency of the HVAC units at issue, but rather simply opines that the upgrade from one model to another was unreasonable.  Thus, Starr contends, Mr. Hoey did not need to disclose any "data" related to efficiency ratings as that was simply not the issue before him.

The Court again concludes that Calfox's arguments go to the weight of Mr. Hoey's opinions, not their admissibility.  On cross-examination, Calfox can seek to undermine Mr. Hoey's testimony by pointing out his use of new construction prices in contrast to the restoration

involved in this case.  It can highlight to the jury that he used a non-competitive bid in order to price roof repairs.  It can also bring out the distinction that it argues is critical between the "construction management fees," as that is used in the price-estimating software, and "overhead" and "profit" as those terms are used by Calfox's witnesses.  But the Court concludes that Mr. Hoey's opinions are based on the type of data relied upon by experts in the field.  For all of these reasons, Calfox's Motion to Strike the Testimony of Grant Hoey is DENIED.

### D.  Defendants' Joint Motion to Exclude Expert Testimony of Sean O'Malley and Tyler Wood Pursuant to Fed. R. Evid. 702

The final Motion before the Court is the request by Defendants to exclude the testimony of Calfox's expert witnesses, Sean O'Malley and Tyler Wood.  (ECF No. 123.)  Calfox requests that the Court hold a hearing to permit argument and evidence to be presented on this Motion. (ECF No. 130.)  The Court concludes, however, that an evidentiary hearing will not assist it to resolve the Motion.  That request is therefore denied.  The Court will address each witness in turn.

#### 1.  Sean O'Malley

Mr. O'Malley was disclosed by Calfox as a non-retained expert who would testify to almost every issue in this case: (1) "the extent of damage related to the June 30, 2018 hail storm"; (2) "scope and methodology of repair"; (3) "reasonable cost to repair Plaintiff's Property"; (4) "depreciation of the materials used to repair the property"; and (5) "industry standards of claims handling."  (ECF No. 123-4, p.5.)  Calfox also apparently intends to call Mr. O'Malley as a fact witness.  (ECF No. 144, p.13.)  Defendants ask the Court to exclude Mr. O'Malley's expert testimony because he is employed by Calfox's public adjuster firm, C3.  C3 was hired on a contingency basis—C3 will receive 15% of all proceeds Calfox receives from its insurance claim.  (ECF No. 123-1, p.1.)  Mr. O'Malley, while not a direct beneficiary of the fee

in a given case, also earns a bonus based on the performance of C3 as a whole.  (ECF No. 123-5, p.55.)  Defendants argue that because Mr. O'Malley has a financial stake in the outcome of this litigation, he cannot be impartial.

Calfox responds that, while courts generally will not permit a witness with a financial stake in the outcome to testify as experts, the Court should do so in this case.  (ECF No. 130.) Specifically, Calfox argues that Mr. O'Malley's evidence would be more probative than prejudicial in this case because Calfox's retained expert who was to testify about the extent of the damage to, and the methodology to repair, the mechanical units on the property, unexpectedly passed away.  Thus, Calfox argues, it no longer has another witness to testify to those issues and Mr. O'Malley's testimony would be the only source of that information.

"Every person is competent to be a witness unless these rules provide otherwise.  But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 601.  There is no controlling statute in Colorado that would dictate Mr. O'Malley's competency to testify as an expert in light of the contingency fee arrangement.  Nevertheless, as a general rule, it is "a settled principle of American law: expert witnesses should not receive contingent fees."  *City & Cty. of Denver v. Bd. of Assessment of the State of Colorado*, 947 P.2d 1373, 1379 (Colo. 1997).  This principle is well accepted because "an expert witness whose fee is contingent upon the outcome is improperly motivated and can not objectively inform the court on an issue about which the court needs additional instruction."  *Id.*  Put another way, "[o]nce the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded."  *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452 at *4 (D. Colo. Oct. 31, 2014).  In the specific context of expert testimony,

"the usefulness of an expert witness 'depends in large measure on the degree to which the expert is able to convince the trier of facts of his or her strict and unyielding impartiality to both the parties and their counsel, and to the issues in the case.'" *City & Cty. of Denver*, 947 P.2d at 1379 (quoting 1 Douglas Danner & Larry L. Varn, *Expert Witness Checklists* § 1:54 (1993)).

The Court concedes that the exclusion of Mr. O'Malley's opinions will be prejudicial to Calfox. This Motion, however, was filed more than one year ago, and Calfox has in that time never attempted to designate a new expert in this area, nor did it request that discovery be reopened. "[W]hile the pretrial order defines a lawsuit's boundaries in the trial court and on appeal, 'total inflexibility is undesirable.'" *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (quoting *Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584, 588 (10th Cir. 1987)). Under these circumstances, the factors for granting such a request would appear to favor Calfox, had it asked. *See id.* (noting that courts should consider (1) the prejudice or surprise to the party against whom the witness would have testified; (2) that party's ability to cure the prejudice; (3) the extent to which calling an unlisted witness would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness that necessitated such relief). The Court must exercise its gate keeping role to exclude unreliable evidence from trial, and it cannot abdicate that role because of inaction on the part of Calfox.

As the Parties note, Calfox offers Mr. O'Malley as both an expert witness and a fact witness. The Court will permit him to testify as a fact witness. His testimony as to the events that transpired during this claim process will be useful to the jury, given that he was one of the key participants. But the Court must GRANT Defendant's Motion to Exclude Mr. O'Malley's Expert Testimony.

### 2. *Tyler Wood*

Mr. Wood, a roofing contractor, was retained by Calfox to testify regarding the scope and

methodology of repairing the roof, as well as the reasonable cost to do so.  (ECF No. 123-4, p.4.)

Defendants request that the Court exclude Mr. Wood's opinions because, they assert, his

opinions "are built on the unreliable opinions of O'Malley or at the behest of counsel."  (ECF

No. 123, p.13.)  For this proposition, Defendants note that Mr. Wood received editable Xactware

files from Mr. O'Malley (acting in his capacity as public adjuster for Calfox) and that he then

manipulated those files.  Defendants also state that Mr. Wood removed certain costs at the

request of Counsel, rather than doing so because it would have been his usual practice.

Defendants also argue that Mr. Wood improperly relied on measurements generated through a

computer program to determine the size of the roofs.

Calfox responds by noting that experts may rely on data collected by others to form their

opinions.  (ECF No. 130.)  Furthermore, Calfox notes that Mr. Wood explained why and how he

used the pre-existing files—namely that it would have taken him an excessive amount of time to

start from scratch, and that the file was largely accurate, thereby permitting him to make the

modifications he believed were necessary.  For example, Calfox points out, Mr. Wood made

changes to the intake vents that were listed in the existing file so that they would meet code

requirements.  Mr. Wood then also admittedly removed certain items from his estimate.  The

original file he received contained estimates for items on which he was not asked to opine—for

example, the replacement of gutters.  As a roofing contractor, Mr. Wood's expertise is narrower

than the full scope of work that Calfox asserts is needed on the property, so he adjusted the

estimate accordingly.  He also apparently adjusted the labor cost for the demolition of the roof,

from the cost required to have that work performed by roofing labor to the less expensive cost of

having the work done by demolition labor.  Calfox points out that Defendants do not argue that

the use of the less expensive labor resulted in any error in Mr. Wood's opinion.  Finally, Calfox

points out that Mr. Wood also inspected the property, confirmed the accuracy of the

measurements of the roof, used his expertise to adjust the Xactimate estimate to reflect the information he compiled, and that his methods were based on industry standard estimating tools.

The Court ultimately agrees with Calfox that Defendants' objections to Mr. Wood's testimony go to the weight of his opinions, not their admissibility. Defendants are free to cross-examine Mr. Wood in order to bring to the jury's attention the fact that he removed certain costs at the behest of counsel or that he used software to help him calculate the size of the roof. The Court is satisfied that Calfox has demonstrated Mr. Wood used a methodology that is reliable and of the type reasonably relied upon by experts in the field. Defendants' Motion to Exclude the Expert Testimony of Mr. Wood is therefore DENIED.

## IV.  CONCLUSION

Accordingly, it is **ORDERED**

(1)     That Calfox's Motion for Determination of Law and Partial Summary Judgment (ECF No. 82) is GRANTED IN PART AND DENIED IN PART:

   a.  The Motion for Determination of Law is GRANTED as set forth above;

   b.  The Motion for Summary Judgment is DENIED;

(2)     That Starr's Motion for Partial Summary Judgment (ECF No. 84) is DENIED;

(3)     That Calfox's Motion to Limit Testimony of Defendant's Expert William J. Badini Pursuant to Fed. R. Evid. 702 (ECF No. 119) is DENIED;

(4)     That Calfox's Motion to Strike Testimony of Defendant's Expert Grant Hoey Pursuant to Fed. R. Evid. 702 (ECF No. 120) is DENIED; and

(5)     That Defendants' Joint Motion to Exclude Expert Testimony of Sean O'Malley and Tyler Wood Pursuant to Fed. R. Evid. 702 (ECF No. 123)

is GRANTED IN PART AND DENIED IN PART.

DATED this 11th day of March, 2024.

BY THE COURT:

RAYMOND P. MOORE
Senior United States District Judge